IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Lewis T. Babcock, Chief Judge

Civil Case No.  03-cv-01212-LTB-PAC

JACK J. GRYNBERG and
GRYNBERG PRODUCTION CORPORATION and its successors, GRYNBERG
PETROLEUM COMPANY and its successors,

      Plaintiffs,

v.

SHELL EXPLORATION B.V., and
SHELL INTERNATIONAL EXPLORATION AND PRODUCTION B.V. f/k/a
SHELL INTERNATIONAL PETROLEUM MAATSCHAPPIJ B.V.,

      Defendants.

_____

MEMORANDUM OPINION AND ORDER
_____

Babcock, C.J.

      The defendants, Shell Exploration B.V. ("Shell Exploration") and Shell International

Exploration and Production B.V. f/k/a Shell International Petroleum Maatschappij B.V. ("Shell

International"), and the plaintiffs, Jack J. Grynberg ("Grynberg"), Grynberg Production

Corporation ("Grynberg Production"), and Grynberg Petroleum Company ("Grynberg

Petroleum"), have filed cross motions for summary judgment on the questions whether the

plaintiffs' claims – unjust enrichment and breach of fiduciary duty – are barred by the statute of

limitations and the doctrine of laches.  The motions are adequately briefed and oral argument

would not materially aid their resolution.  For the reasons stated below, I DENY the plaintiffs'

motion and GRANT the defendants' motion.

      The plaintiffs initiated this action on July 3, 2003.  The parties agree that the applicable

period of limitation – under the statute and the correlating laches doctrine – is three years, but disagree on when the limitations period commenced.  The parties also agree that Colorado law governs the plaintiffs' claims.  The material facts are undisputed; only their legal significance remains to be determined.

## I.  Facts

In July, 1990, Mr. Grynberg met with Yorck H. de Heer, legal counsel to Shell International and Shell Exploration, to discuss exploration and possible exploitation of the Kashagan Field, a potential oil field in the Caspian Sea within the jurisdiction of Kazakhstan. (Mr. Grynberg also claims to have discussed the project with P.E.R. Lovelock, a former geological advisor for Shell International, but Mr. Lovelock denies it.)  Mr. Grynberg was acquainted with Nursultan A. Nazarbaev, President of Kazakhstan and former First Secretary of the Communist Party of Kazakhstan SSR ("Nazarbaev") and intended to assemble a consortium of enterprises to render the Kashagan Field profitable in cooperation with the Kazak government. He anticipated that the defendants would be interested in the venture and communicated to Mr. De Heer geological and seismic data concerning the Kashagan Field, which he had obtained from Kazak sources.  In exchange, Mr. Grynberg expected to receive a "carried interest," which would consist of 20% of the defendants' earnings from the Kashagan Field less costs and expenses.  No written agreement embodying these terms appears in the record, but Mr. Grynberg maintains that the defendants assented "in principle."

On June 9, 1993, Kazakhstan and several oil companies, including Shell Exploration, entered into a Preliminary Consortium Agreement ("PCA").  The plaintiffs were not parties to the PCA.  The parties agreed in the PCA to negotiate the terms of a consortium agreement, which

would govern environmental and seismic research, prerequisite to exploration for oil in the Kashagan Field. The PCA contained no provision for exploratory drilling or production of hydrocarbon products. The PCA did not grant to Shell Exploration or the other oil companies rights to develop the Kashagan Field for commercial purposes.

The PCA received contemporary press in the *Los Angeles Times*, *The New York Times*, and *Financial Times* (of London). Though the press did not mention the Kashagan Field by name, the articles disclosed that participants, including the defendants, would survey an area "in the Caspian Sea," the "Caspian Shelf," and "Kazakhstan's entire shelf in the North Caspian." *Financial Times* reported, "No matter what is found, no oil is expected from the shelf before the turn of the century."

On June 10, 1993, *The Wall Street Journal* reported the execution of the PCA. The article mentioned that Royal Dutch/Shell Group, among others, was participating in formation of the proposed consortium and quoted oil executives as stressing that the field's potential was not yet estimated and that the agreement was only for "exploration." Mr. Grynberg read the article, from which he surmised that the signatories to the PCA had agreed to assemble a "study consortium" for the purpose of conducting geological and environmental surveys, and would agree to the terms of production if any oil was found. He wrote a letter to the Vice President of British Gas Corporation, a signatory to the PCA, expressing his congratulations and his expectation that he would participate in any profit. He wrote, "I am delighted it has finally come through for all of us. Based on the article in today's *Wall Street Journal* let's hope this effort will result in the discovery of the world's greatest oil accumulation."

On December 3, 1993, the parties to the PCA, including Shell Exploration, executed a

Consortium Agreement, finalizing the terms on which the seismic survey and other research would proceed.  Like the PCA, the Consortium Agreement contained no license to exploit the territory for commercial ends.  *The New York Times* reported that the signors had agreed "to explore for oil in the northern part of the Caspian Sea shelf."  *Lloyd's List* reported that exploration would occur in the "Kazakhstan sector of the Caspian Sea" and referred to the PCA governing studies "on the Caspian shelf."  The correspondent speculated that development and production would "possibly" commence "after the year 2000."

On November 18, 1997, after completion of the requisite surveys and studies, the parties to the Consortium Agreement entered into a Production Sharing Agreement ("PSA"), settling the terms by which they would exploit the resources of the Kashagan Field.  By the PSA, Kazakhstan granted to Shell Kazakhstan Development B.V. and other energy companies a license to "use underground resources for exploration and production of hydrocarbons" within the designated territory for specified, renewable periods of time.  The oil companies assented to minimum expenditures on drilling and exploration.  The PSA delineates the boundaries of the areas to be explored, specified to the latitudinal and longitudinal minute.

Over the ensuing days, reports of the PSA appeared in periodicals, including *Financial Times*, *Lloyd's List*, and *Oil & Gas Journal*.  On November 18, 1997, *The New York Times* reported that President Nazarbaev was in Washington, D.C. to approve two "long-awaited energy deals."  One of the deals, the paper proclaimed, covered "the Kashagan field in the Caspian Sea, part of a vast offshore tract that seismic studies indicate may be the largest single oil deposit so far found in the Caspian Sea Basin."  The article cautioned that, while geologic features of the field offered promise, the oil companies would "not know precisely what is

4

contained beneath Kazakhstan's north Caspian shelf until drilling begins." The report identified the signatories to the deal, including "Shell." Other periodicals also mentioned the Kashagan Field by name or gave the approximate location of the exploration. The participants in the deal were widely announced.

On November 24, 1997, *Oil & Gas Journal* disclosed that participants in the venture had completed a seismic survey and were prepared to begin drilling exploratory wells. It quoted a participant's prediction that the first well would be drilled in 1998 and that development and production would occur some time later.

Mr. Grynberg concedes that he knew as early as June, 1993 that the defendants and others were venturing in the Caspian Sea. Though he insists that he did not know specifically where the exploration was occurring, he admits that the Kashagan Field was the only possibility located in the Caspian Sea. Over the months following execution of the PSA, Mr. Grynberg made unsuccessful efforts to obtain information about the project and the terms on which it was proceeding. He contacted representatives of Kazakhstan, Chevron, and British Petroleum, whom his entreaties failed to move. He suspected that the defendants had appropriated his allegedly confidential information, but did not attempt to contact anyone at Shell Exploration, Shell International, or affiliated Shell entities.

Following execution of the PSA, Mr. Grynberg attempted for several months without success to access the document. He obtained a copy in January, 2002 from the Barrows Company, which had published it. From the PSA, Mr. Grynberg confirmed that Shell Exploration and other petroleum companies were exploring in the Kashagan Field and that they had discovered oil in the middle of the territory he had years earlier identified. He then filed

lawsuits against these defendants and other entities with which he had purportedly shared confidential information.

## II.  Discussion

It is beyond dispute that the claims accrued, and the three-year limitations period commenced, when Mr. Grynberg and the plaintiffs knew or had reason to know of the existence and cause of the injury which is the basis of their action.  Colo. Rev. Stat. § 13-80-108(1); *Anderson v. Somatogen, Inc.*, 940 P.2d 1079, 1083 (Colo. Ct. App. 1996), *cert. denied*, (1997); *Alexander v. Oklahoma*, 382 F.3d 1206, 1215 (10th Cir. 2004), *cert. denied*, 544 U.S. 1044, 125 S. Ct. 2257, 161 L. Ed. 2d 1080 (2005).  The plaintiffs had reason to know of their injury when they should have discovered it through the exercise of reasonable diligence.  *Anderson*, 940 P.2d at 1083; *Industrial Constructors Corp. v. United States Bureau of Reclamation*, 15 F.3d 963, 969 (10th Cir. 1994).

Resolution here requires precision.  It matters what injury the plaintiffs claim to have suffered.  If, as the defendants argue, the plaintiffs were injured when Shell Exploration used Mr. Grynberg's purportedly confidential information to solicit Kazak sanction, then the claims here accrued on June 9, 1993, or at the latest on December 3, 1993, when reports of a consortium assembled without Mr. Grynberg's involvement circulated in the international press.  If the injury occurred when the oil companies agreed with Kazakhstan to exploit the Kashagan Field, then the claims accrued when Mr. Grynberg through the exercise of reasonable diligence should have discovered the existence of the PSA.  If, as the plaintiffs argue, the injury was inchoate until the oil partners declared the Kashagan Field commercial on June 28, 2002, then the claims are timely.

Demonstration of a fiduciary duty to preserve confidential information, the duty the

6

defendants are alleged to have breached here, requires proof "that a special trust or confidence was in fact reposed, that its reposition was justifiable, and that the other party either invited or ostensibly accepted the trust imposed." *First Nat. Bank of Meeker v. Theos*, 794 P.2d 1055, 1061 (Colo. Ct. App. 1990). A fiduciary breaches the duty when he discloses the confidential information to a third party. *Rubenstein v. South Denver Nat'l Bank*, 762 P.2d 755, 757 (Colo. Ct. App. 1988). For that reason, the injury resulting from a breach of fiduciary duty, triggering accrual of the claim, is the violation of trust, not any attendant financial harm. Colo. Rev. Stat. § 13-80-108(6) ("A cause of action for breach of any express or implied contract, agreement, warranty, or trust shall be considered to accrue on the date the breach is discovered or should have been discovered by the exercise of reasonable diligence."); *Polk v. Hergert Land & Cattle Co.*, 5 P.3d 402, 405 (Colo. Ct. App. 2000). The plaintiffs were injured not when they suffered economic consequences, but rather when Shell Exploration contracted with the consortium in reliance upon and with the assistance of the information Mr. Grynberg imparted to Mr. de Heer. *Compare*, *Lucas v. Abbott*, 601 P.2d 1376, 1378 (Colo. 1979) ("An action on any trust accrues at such time as the claimant attains, or reasonably could have attained, notice of the trustee's use of the trust property in a manner which is inconsistent with the claimant's interest.") Mr. Grynberg knew of that breach on June 10, 1993, more than ten years before he filed this action. At the very latest, periodical reports in November, 1997 explicitly proclaimed that the consortium had agreed to develop the Kashagan Field for commercial purposes, and Mr. Grynberg concedes that he then suspected the defendants of having dealt directly with Kazakhstan. It is undisputed that Mr. Grynberg did not at that time or over the ensuing years attempt to contact the defendants or their corporate affiliates.

7

The plaintiffs argue that their fiduciary duty claim could not have accrued until they suffered monetary damages, which, they assert, occurred when the Kashagan Field was on June 28, 2002 designated as a commercial discovery under the PSA. Until that time, they protest, they suffered no loss and were deprived of no profit share. However, a claim for breach of confidentiality does not require proof of economic loss; the injury is the disclosure of protected information. Indeed, the purpose of such a claim is to remedy not a lost contractual expectation but rather the loss of secrecy.

*Grant v. Pharmacia & Upjohn Co.*, 314 F.3d 488, 493 (10th Cir. 2002) is particularly instructive on this point. The court in that case determined that the plaintiffs' claim for breach of fiduciary duty accrued on the date the plaintiffs learned of the breach. The court rejected the plaintiffs' argument that the claim did not accrue until damages later accrued because "uncertainty as to the precise extent of damage neither precludes the filing of a suit nor delays the accrual of a claim for purposes of the statute of limitations." *Grant*, 314 F.3d at 493 (*quoting Broker House Intern., Ltd. v. Bendelow*, 952 P.2d 860, 863 (Colo. Ct. App. 1998)).

*Patterson v. BP America Production Co.*, __ P.3d __, 2006 WL 1171957 (Colo. Ct. App. 2006) is not contrary. That case consisted of a claim for breach of contract, which accrued when the claimant had reason to believe that the defendant had breached the contract.

Similarly, the plaintiffs' claim for unjust enrichment accrued more than three years before July 3, 2003. "In Colorado, a plaintiff seeking recovery for unjust enrichment must prove: (1) at plaintiff's expense (2) defendant received a benefit (3) under circumstances that would make it unjust for defendant to retain the benefit without paying." *Salzman v. Bachrach*, 996 P.2d 1263, 1265-1266 (Colo. 2000). The Restatement, which the Colorado Supreme Court has adopted,

8

explains that the benefit is anything that adds to the defendants' security or advantage and can consist of, among other things, an interest in money, land or chattels.  Restatement of Restitution § 1, comment b (1937); *Cablevision of Breckenridge, Inc. v. Tannhauser Condominium Ass'n*, 649 P.2d 1093, 1097 (Colo. 1982).

The plaintiffs argue that the defendants did not realize any benefit until June 28, 2002, when the parties to the PSA declared the Kashagan Field commercial.  This, however, is too narrow an understanding of the term "benefit."  As the Federal Circuit has determined, the acquisition of exclusive rights, such as those that the defendants enjoy under the PSA, is a benefit under Colorado restitution law.  *University of Colorado Foundation, Inc. v. American Cyanamid Co.*, 342 F.3d 1298, 1310 (Fed. Cir. 2003), *cert. denied sub nom.*, *Wyeth Holdings Corp. v. University of Colorado Foundation, Inc.*, 541 U.S. 988, 124 S. Ct. 2028, 158 L. Ed. 2d 493 (2004).  In addition to any profit that might result, possession of a share of rights under the PSA entitles the possessor to exclude non-contracting parties from exploitation of the Kashagan Field. This right has value as between the defendants and the plaintiffs.  Indeed, Mr. Grynberg complains chiefly of his exclusion from the consortium, which he believes he was authorized to assemble.  Also, the defendants' share in the PSA has market value.  Though the PSA provides that shares in the consortium are assignable only under certain conditions, the shares are not inalienable.  And parties to the PSA may, within limits, encumber their interests in the PSA as collateral for the financing of their obligations under the PSA.

It is clear, then, that the plaintiffs' claim for unjust enrichment accrued when Mr. Grynberg should have discovered Shell's interest in the Kashagan Field through the exercise of reasonable diligence.  Mr. Grynberg concedes that he made no effort to contact the defendants or

their representatives or affiliates after learning of the PSA.  Though he denies having read the articles concerning the execution of the PSA in 1997, he does not deny that he was aware of the PSA in the 1990's.  Indeed, he claims to have contacted officials of oil companies known to be parties to the PSA (none from Shell) and of Kazakhstan.

Recasting the same argument, the plaintiffs assert that their injury was speculative until June of 2002; their claim for 20% of the defendants' earnings from the Kashagan Field, less costs and expenses, was meaningless until the defendants realized earnings from which their share could be calculated.  However, the plaintiffs have stated no such claim.  Should the plaintiffs succeed on their claim of unjust enrichment, their recovery would be not expectation damages but rather restitution of any benefit conferred at their expense.  *DCB Const. Co. v. Central City Development Co.*, 965 P.2d 115, 118-119 (Colo. 1998); *University of Colorado Foundation*, 342 F.3d at 1310-1312.  "A party who has been unjustly enriched generally must make restitution to the other party by returning that party to the position it previously occupied."  *Interbank Investments, LLC v. Eagle River Water and Sanitation Dist.*, 77 P.3d 814, 816 (Colo. Ct. App. 2003) ("*Interbank II*").

*Interbank Investments, L.L.C v. Vail Valley Consol. Water Dist.*, 12 P.3d 1224, 1228 (Colo. Ct. App. 2000) ("*Interbank I*") does not change this result.  In that decision, the Colorado Court of Appeals determined that the date of accrual of the plaintiff's claim for breach of contract was not the date on which the defendants first benefitted from the plaintiff's expenditures but rather the date on which the defendants were first obligated to reimburse the plaintiff.  The determination of the accrual date, therefore, turned on the question of the parties' rights and obligations under their express agreements.  *Id*. at 1229.  It is clear, then, that despite the court's

10

references in dicta to the plaintiff's unjust enrichment claim, the decision did not settle the issue when that claim might have accrued.  That inference is bolstered by the court's decision in *Interbank II* in which, on appeal after remand of *Interbank I*, the court determined that the plaintiff's unjust enrichment claim was precluded by the express contracts covering the subject matter.  *Interbank II*, 77 P.3d at 816.

Accordingly, it is ORDERED that

1) the plaintiffs' motion to file supplemental authorities [172] is GRANTED;

2) the plaintiffs' motion for partial summary judgment [116] is DENIED;

3) the defendants' motion for summary judgment [122] is GRANTED; and

4) judgment shall enter for the defendants on all claims with costs.

Dated: June ___6___, 2006, in Denver, Colorado.

BY THE COURT:

   s/Lewis T. Babcock
Lewis T. Babcock, Chief Judge

11